16 A.3d 352

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. WILLIAM E. RIVERA, A/K/A JUAN RIVERA,
DEFENDANT–APPELLANT.

Argued March 1, 2011—Decided April 26, 2011.

*Lon C. Taylor,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Sara B. Liebman,* Assistant Prosecutor, argued the cause for respondent (*Theodore J. Romankow,* Union County Prosecutor, attorney).

*Michael A. Baldassare* and *Jennifer Mara* submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Gibbons,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

Defendant William E. Rivera was convicted of the gruesome mutilation murder of his wife and the desecration of her remains. He did not deny killing his wife; his defense was that he was insane, and therefore should not be held culpable for his actions.

At trial, defendant did not give notice of an intent to rely on diminished capacity as a defense and did not request that the jury be charged in respect thereof. For the first time on appeal, defendant asserted that the trial court had erred in failing to instruct the jury on diminished capacity, that is, that he suffered from a mental disease or defect that would negate the knowing or purposeful state of mind required to be liable for the crimes of which he had been convicted: the knowing or purposeful murder of his wife, and the knowing and unlawful desecration of her remains. The Appellate Division reasoned that the failure of the trial court to charge the jury on diminished capacity—in the absence of a request by defendant and on its own motion—was error. It concluded, however, that the error did not rise to the level of plain error as it was not clearly capable of producing an unjust result. It therefore affirmed defendant's convictions and sentence.

Although we affirm the judgment of the Appellate Division, we reach that result via a different path, one that lies in parallel with the standard that governs a court's obligation to charge the jury sua sponte in respect of either lesser-included offenses or defenses. We hold that a trial court's obligation, on its own motion, to charge the jury in respect of theories that negate responsibility must be grounded in fact, and that duty does not arise unless, without scouring the record, it is clearly indicated or clearly warranted by the evidence adduced. In this appeal, the psychiatric evidence presented by defendant focused only on his insanity defense and did not address whether defendant suffered from a diminished capacity sufficient to negate the mental state required to impose liability for the crimes of which he then stood charged. For that reason, we conclude that the trial court was not under a sua sponte duty to charge the jury on diminished capacity and, hence, the failure to do so did not constitute error.

## I.

The facts are largely uncontradicted. Defendant and his wife Ana married at some time in the late 1980's. By 1995, they had

become estranged and defendant returned to his native Guatemala alone; Ana remained in New Jersey with her two children from a prior marriage. While in Guatemala, defendant was seriously injured in a car accident. As a result, defendant became disabled in several respects, and one of his legs withered.

He returned to New Jersey in early 2004 and, while living with his mother and brother in Plainfield, defendant resumed what the record describes as a "dating" relationship with Ana. During the evening of February 28, 2004, Ana drove to the home defendant shared with his mother and brother, and collected defendant. When they came back to defendant's home some two hours later, they went into his bedroom.

Although defendant's bedroom adjoined that of his mother and was but one floor removed from his brother's bedroom, no one in the house heard any sounds of fighting or struggling. Later that night, defendant, bearing knife wounds to his neck and chest, woke up his brother. Defendant told his brother that Ana was dead, that she had tried to kill him, and that she had tried to mutilate her own breasts; he handed his wallet and watch to his brother and asked him to take care of his children.

Defendant's brother called the police, who found defendant seated on the steps, bleeding from his chest wound. Defendant's brother led the police to defendant's room. There they found Ana's body, still in the bed, with the covers pulled to her nose and with blood seeping through. When the police removed the covers, they "discovered the victim had been sliced almost in half from her neck down to her vagina and it was open and there was a knife in her hand." They also observed that Ana's body had been mutilated. The medical examiner later opined that Ana had died from certain stab wounds inflicted by the knife recovered at the murder scene, that additional stab wounds had been inflicted after she had died, and that her breasts and genital organs had been removed post mortem. Defendant later admitted that he had staged Ana's body by placing the knife in her hand. DNA retrieved from the knife, the bed sheets, and from other sources matched defendant.

The trial did not address what had happened to Ana that night—she obviously had been killed and mutilated—or who had done that to her—it was equally obvious that those were defendant's acts. As represented by defendant before this Court, "[t]he sole issue at trial was defendant's state of mind as it pertained to the grisly killing of his estranged wife." Defendant did not testify. Instead, he relied on the testimony of Dr. Robert Latimer, a specialist who is board-certified in psychiatry and forensic psychiatry. Dr. Latimer's testimony is crucial to the consideration of defendant's appeal; for that reason, his testimony is explored in detail.

After reviewing Dr. Latimer's qualifications, being offered and qualified to opine in the field of forensic psychology, and describing his several examinations of defendant, Dr. Latimer testified as to the dual purposes of his examination:

Q. Okay. And would it be fair to say, just so that we're clear, that you were asked to do an examination for two different purposes?

A. Well basically when you're called to examine a person who is charged with a crime, with a major crime or with any crime, basically you're asked to determine number 1, is there a psychiatric illness. Does this psychiatric illness interfere with his understanding of knowledge of right or wrong, or did he understand the nature of the acts or the consequences of his acts or was he in some way impaired so that he could not have acted with knowledge or purpose as the law defines those terms in relation to the charges that he's being prosecuted for.

Additionally, the courts always want to know that the person is competent under the New Jersey statute to proceed with the legal process because if the person does not understand or is disoriented or he's confused or is demented or has an Alzheimer's problem or mental disease or mental retardation, the court is not going to prosecute somebody who is not competent to assist his counsel on his behalf and to articulate a defense. He has to be able to assist, to understand and to intelligently and knowingly proceed with the judicial process, and that's what a psychiatrist does.

The trial court immediately called counsel to sidebar, where the following colloquy ensued:

THE COURT: I just want to be sure. There was some talk early on about—

[THE PROSECUTOR]: Diminished capacity.

THE COURT: No, no, no, not diminished capacity, some talk about no witness testifying about the prior assault, right, in Guatemala.

[DEFENSE COUNSEL]: Yeah.

THE COURT: Did you tell him about that?

[DEFENSE COUNSEL]: Yeah.

THE COURT: You may not finish [with] him today. You let him talk through [a] stream of consciousness. If you can, reign him in a little.

That offhand comment by the prosecutor was the single mention of diminished capacity throughout the entire trial.

After Dr. Latimer stated that he had concluded that defendant was competent to stand trial, his testimony continued:

Q. Now what was the focus of your examination after you determined that he was competent? Was your focus on his thought process on February 28th, 2004 [the day of the murder]?

A. The focus of my examination was on or about February the 29th, 2004 [1] was he suffering or did he suffer a diagnosable psychiatric illness. If there had been such an illness present, was this illness serious enough to cause him to be unaware of the difference between right or wrong in relation to those offenses or was he capable of understanding the nature of his acts, the physical nature of his act, the consequences of that act and whether they were right or wrong, and *this is what is called an insanity evaluation.*

Q. Were you able to arrive at a diagnosis in this case?

A. Yes, I did.

Q. What was that diagnosis?

A. It was my conviction that on the date in question 4–29–04 [2] he was suffering from an acute psychiatric condition known as a brief psychotic reaction or disorder which is manifested by excessive turmoil, confusion, violence, disorganized behavior and which frequently ends up in either homicide or suicide according to the requirements of the diagnostic manual which is the official diagnostic book of the American Psychiatric Association.

Q. Is that loosely referred to as the DSMV?

A. DSM Fourth Ed. DS standing for Diagnostic and Statistical Manual.

[ (emphasis supplied).]

To support his diagnosis of defendant having suffered from "a brief psychotic reaction or disorder" as defined in the psychiatric literature, Dr. Latimer described his repeated interactions with defendant, noting that "my problem is and the reason I wanted to discuss this issue with him several times is[,] is he telling me a

---

[1] That date reference clearly was mistaken: the murder occurred on February 28, 2004. No one objected to that mistake.

[2] *See* n. 1, *supra.*

story that would be to his advantage." He described defendant's behavior as "bizarre, unplanned, illogical that it took place in his home in the bedroom next to his mother. Nobody heard anything. Nobody heard any yelling or shouting or screaming." Dr. Latimer explained:

> Q. When you make these conclusions [that defendant was "acting but his mind is not there"] are you arriving at these conclusions to a reasonable medical certainty based on your experience and training?
>
> A. Of course because this case fits classically with, with dozens of cases that are described in the literature of sudden violence, suicidal activity, mutilation, homicides which are a product of an acute episode in which the person is not thinking. . . .
>
> Q. Given this diagnosis you've made there's nothing we can look at, see, hear, smell that would let us know this may be coming about? It's something that can happen out of the blue?
>
> A. *This happens like lightning.* This is where the term catathymic suggest[s] that *it happens like a lightning strike.* . . .
>
> [ (emphasis supplied).]

He ultimately opined as follows:

> Q. Okay. And it's your opinion just to a reasonable medical certainty [defendant] didn't know what he was doing on that day?
>
> A. He did not know what he was doing.
>
> Q. He had a brief period of insanity?
>
> A. He did. And those periods can last a few minutes, a few hours, a few days and then they get restored back to the status that they were before the event.
>
> Q. And this is a condition that is well documented in medical literature?
>
> A. Well there is an accepted diagnostic category [brief psychotic disorder] in which the mortality is very high, and the diagnostic manual cautions you that mortality is high in these events. The person kills or commits suicide.

Tellingly, at no point in his testimony did Dr. Latimer opine that, at the time he killed his wife, defendant was suffering from diminished capacity, even though Dr. Latimer had listed whether a subject was suffering from diminished capacity as one of the three main purposes for a psychiatric examination of a defendant in a criminal case. Dr. Latimer's testimony, as elicited by defendant, entirely bypassed the notion of diminished capacity and was solely and exclusively focused on two areas: that although defendant was competent at the time of trial, he was insane at the time

of the killing and, hence, was not legally responsible for his actions.

During cross-examination, Dr. Latimer admitted that, "if an illness, a mental illness doesn't fit within a psychiatric category[,] basically you can't diagnose the person as having that illness." Dr. Latimer also admitted that, in making his diagnosis, he had relied on the definition in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition*—commonly known as the DSM–IV or the DSM–IV–TR [3] —"describing something called Brief Psychotic Disorder[.]" Yet, although Dr. Latimer described defendant's condition as one that occurred like a "lightning strike," the DSM–IV defines a "brief psychotic disorder" as one "typically [caused by] an extremely stressful event or trauma" and requires the "[p]resence of psychotic symptoms (delusions, hallucinations, disorganized speech, and/or disorganized behavior) *which lasts at least one day* but no more than one month." *Id.* at 332 (emphasis supplied).[4] Dr.

---

[3] According to the American Psychiatric Association, the fifth edition of this work—the DSM–V—is not scheduled for publication until 2012 and, because the DSM–IV was originally issued in 1994, an interim text revision called the DSM–IV–TR was in use in order to "maintain the currency of the *DSM–IV* text, which reflected the empirical literature up to 1992." *See* American Psychiatric Association, *"DSM–IV–TR: The Current Manual," available at* http://www.psych.org/MainMenu/Research/DSMIV/DSMIVTR.aspx. The record reflects that, at least when cross-examined, Dr. Latimer testified in respect of the DSM–IV–TR.

[4] This Court previously has relied on various iterations of the DSM–IV as an authoritative source. *See, e.g., State v. Burr,* 195 *N.J.* 119, 123 n. 2, 948 *A.*2d 627 (2008) (applying DSM–IV definition of Asperger's Disorder); *Patterson v. Bd. of Trs., State Police Ret. Sys.,* 194 *N.J.* 29, 49, 942 *A.*2d 782 (2008) (describing DSM–IV–TR as "a handbook published by the American Psychiatric Association, [that] categorizes known mental disorders for the purpose of diagnosis"); *T.H. v. Div. of Developmental Disabilities,* 189 *N.J.* 478, 485–87, 916 *A.*2d 1025 (2007) (relying on DSM–IV–TR's description and standards for diagnosis of Asperger's Disorder); *State v. Jimenez,* 188 *N.J.* 390, 395–96, 908 *A.*2d 181 (2006) (accepting DSM–IV–TR's definition of mental retardation); *State v. Harris,* 181 *N.J.* 391, 529–30, 859 *A.*2d 364 (2004) (same); *Brunell v. Wildwood Crest Police Dep't,* 176 *N.J.* 225, 239–40, 822 *A.*2d 576 (2003) (describing DSM–IV definition of post-

Latimer nevertheless testified that defendant's brief psychotic disorder "lasted from the time he thought he was dozing off . . . until the time that he feels that he's wet in his chest[,]" or a period of no more than a couple of hours.

Immediately following Dr. Latimer's testimony, the trial court conducted the charge conference. It explained that it was

> going to charge [the jury] on lesser included offenses. Then there's a charge that discusses murder, passion provocation, and aggravated manslaughter . . . and I was going to give the desecration of human remains charge which I drafted and gave it to you this morning . . . and then the insanity charge.

After the trial court concluded describing the entirety of the instructions it intended to provide to the jury, the following colloquy ensued:

> THE COURT: Does anybody have anything else that they want charged?
>
> [DEFENSE COUNSEL]: Other than the basics I didn't have anything.
>
> THE COURT: It is, all the basics are there.
>
> [DEFENSE COUNSEL]: Yeah.

No one objected to the proposed jury charges and, more to the point, no one requested that the court charge the jury on the question of whether defendant suffered from diminished capacity, that is, a "mental disease or defect which would negate a state of mind which is an element of the offense." *N.J.S.A.* 2C:4–2.

Following that charge conference, in rebuttal, the State presented the testimony of Dr. Howard Gilman, who is board-certified in psychiatry, forensic psychiatry and geriatric psychiatry. After being qualified as an expert in forensic psychiatry, Dr. Gilman explained that he had examined defendant and, based on that examination and the additional materials he reviewed, he opined affirmatively that "at the time of these crimes[, defendant] did know what he was doing, that he had full appreciation of his actions, and that he had full appreciation of the wrongfulness of murder and desecration." He further opined that, based on everything on which he had relied, "there was nothing to indicate

---

traumatic stress disorder); *State v. Nelson*, 173 *N.J.* 417, 440 n. 2, 803 *A.2d* 1 (2002) (describing DSM–IV definition of borderline personality disorder).

that [defendant]'s state of mind was impaired in any way. He acted, was clearly able to act with purpose and knowledge[,] and was clearly aware of the wrongfulness of killing someone." Responding to Dr. Latimer's diagnosis of defendant as having suffered a brief psychotic disorder, Dr. Gilman made clear that, in order to qualify as a "brief psychotic disorder" under the DSM–IV, the psychosis "has to last a minimum of 24 hours and can last no longer than a month" and that it cannot "come on suddenly and without warning" because "no psychiatric disorders really come on that way." In contrast to Dr. Latimer's opinion, Dr. Gilman specifically opined that defendant did not suffer from a brief psychotic disorder.

The jury rejected defendant's insanity defense, and returned guilty verdicts on both counts of the indictment: first-degree purposeful or knowing[5] murder, in violation of *N.J.S.A.* 2C:11–3(a)(1) and (2), and second-degree unlawful desecration of human remains, in violation of *N.J.S.A.* 2C:22–1(a)(2).[6] On the first-degree murder count, defendant was sentenced to life imprisonment subject to the provisions of the No Early Release Act,

---

[5] Under the *Code*, "[a] person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. 'With purpose,' 'designed,' 'with design' or equivalent terms have the same meaning." *N.J.S.A.* 2C:2–2(b)(1). In contrast, "[a] person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. 'Knowing,' 'with knowledge' or equivalent terms have the same meaning." *N.J.S.A.* 2C:2–2(b)(2).

[6] The statute prohibiting the unlawful desecration of human remains does not explicitly describe its state of mind, or mens rea, requirement. In those instances, the *Code's* "gap-filler," *N.J.S.A.* 2C:2–2(c)(3), "creates a presumptive culpability requirement of 'knowingly' unless a statute provides otherwise." Cannel, *New Jersey Criminal Code Annotated*, Comment 9 on *N.J.S.A.* 2C:2–2 (2010).

*N.J.S.A.* 2C:43–7.2, and, on the second-degree unlawful desecration of human remains count, defendant was sentenced to a consecutive term of ten years' imprisonment.

Defendant appealed and, in an unpublished opinion, the Appellate Division affirmed. Addressing "defendant's contention that he is entitled to a new trial because the trial court failed to instruct the jury on diminished capacity[,]" the panel concluded that the trial court had erred because, in its "view, [Dr.] Latimer's testimony provided a sufficient factual basis for the instruction." The panel offset that conclusion, however, noting that it was "not convinced that the lack of the instruction rose to the level of plain error."

Turning to the standards that govern whether plain error is present, it reasoned that "[b]ecause defendant did not dispute that he killed Ana and desecrated her remains, the critical issue for the jury to resolve was whether defendant acted purposely and/or knowingly in doing so." It noted that "[t]he jury rejected the insanity defense and determined that the State had proven all elements of the charged offenses beyond a reasonable doubt." It declared itself "convinced that the State's evidence that defendant acted purposely and/or knowingly was so strong that it is highly improbable the jury would have come to a different decision if it had been charged on diminished capacity." It remarked that

the jury had ample reason to reject [Dr.] Latimer's testimony. As we have explained, [Dr.] Latimer opined that defendant was suffering from a Brief Psychotic Disorder. He stated that the criteria for such a diagnosis requires that the episode last at least a full day and yet he described defendant's disorder as a "lightning flash." [Dr.] Latimer also stated that defendant did not know what he was doing when he killed Ana and desecrated her body but essentially conceded that the placement of the knife in Ana's dead hand was a purposeful act to "organize the crime scene." In addition, [Dr.] Latimer's opinion was based upon defendant's statements to him, but defendant told [Dr.] Latimer that he did not recall what happened at the time the offenses were committed.

We therefore conclude that the trial court's failure to instruct the jury on diminished capacity was not an error clearly capable of producing an unjust result. *R.* 2:10–2.

Defendant sought certification, which was granted.[7] *State v. Rivera*, 203 *N.J.* 439, 3 A.3d 1227 (2010). On leave granted, the parties filed supplemental briefs, and the Association of Criminal Defense Lawyers of New Jersey submitted a brief as amicus curiae.

## II.

Defendant principally argues that the Appellate Division's decision is internally inconsistent. According to defendant, once the Appellate Division concluded that the diminished capacity jury instruction should have been given, a new trial should have been ordered. By so concluding, defendant claims, "the panel wrongly usurped the role of a jury [when it] found that the absence of the diminished capacity instruction was not plain error." He asserts that, because diminished capacity speaks to a failure of proof in respect of the mental state needed to sustain a conviction, and because evidence of insanity and diminished capacity often overlap, the failure to instruct the jury on diminished capacity when it should have been so instructed never can be harmless error.

The State's primary assertion on appeal is that "the evidence in the record did not support a charge for diminished capacity." Acknowledging solely for the sake of argument the Appellate Division's conclusion that the failure to charge the jury on diminished capacity was error, it secondarily argues that, in the absence of either a request for a jury charge or an objection to the jury instructions, that error must be gauged under the plain error

---

[7] The Appellate Division also rejected two additional arguments advanced by defendant: the alleged improper admission of statements of dislike by Ana's children, and that the life sentence on the first-degree murder conviction was excessive. In his petition for certification, and in his agrument before this Court, defendant focused almost exclusively on the question of whether the failure of the trial court to sua sponte charge the jury in respect of diminished capacity required a new trial. However, in his supplemental brief, defendant repeated his claim that the statements of dislike by Ana's children should not have been admitted in evidence. We address that added point separately at the conclusion of this opinion. *See* n. 9, *infra*.

standard. It urges that "defendant has failed to show that a diminished capacity charge would have produced a different result" and, hence, that "the Appellate Division correctly concluded that there was no plain error[.]"

Amicus, the Association of Criminal Defense Lawyers of New Jersey, asserts that erroneous jury instructions are presumed to be reversible error and that "such errors are 'poor candidates for rehabilitation under the harmless error philosophy.'" (quoting *State v. Crisantos,* 102 *N.J.* 265, 273, 508 *A.*2d 167 (1986)). It concludes that, for those reasons, the failure to issue a jury instruction on diminished capacity in this case compels the reversal of defendant's convictions. It further argues that, "[g]iven that the evidence required to meet the threshold showing for the insanity instruction often overlaps with that required for the diminished capacity instruction," the jury charge in respect of insanity should be modified either to incorporate automatically a charge of diminished capacity or to "trigger a trial court's consideration of the diminished capacity instruction when the defendant has presented evidence toward an insanity defense."

## III.

### A.

Our analysis starts with the applicable mental state limitations on criminal responsibility codified in New Jersey's *Code of Criminal Justice, N.J.S.A.* 2C:1–1 to :104–9. Those provisions address truly threshold notions of criminal responsibility: competence, insanity, and diminished capacity. *See N.J.S.A.* 2C:4–3 (competence); *N.J.S.A.* 2C:4–1 (insanity); *N.J.S.A.* 2C:4–2 (diminished capacity). We address each in that order.

As an initial matter, the *Code* commands that "[n]o person who lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures," *N.J.S.A.* 2C:4–4(a), and it sets forth the elements necessary to

prove competence to stand trial. *N.J.S.A.* 2C:4–4(b). Under this statutory regime, if, after examination, *N.J.S.A.* 2C:4–5, a defendant is adjudged incompetent to stand trial, "the proceeding against him shall be suspended[.]" *N.J.S.A.* 2C:4–6(b). If it also is found that "the defendant is so dangerous to himself or others as to require institutionalization," the defendant may be "commit[ed] to the custody of the Commissioner of Human Services to be placed in an appropriate institution[.]" *Ibid.* If no finding of danger to self or others is made, the court "shall proceed to determine whether placement in an out-patient setting or release is appropriate[.]" *Ibid.*

▮ That said, a determination that a defendant is competent to stand trial does not foreclose disclaiming the requisite mental state needed for the imposition of criminal responsibility for otherwise criminal acts. In the limited context of determining criminal responsibility—and laying aside the question of whether a competent defendant possessed a mental state other than what specifically is required for criminal liability under a defined offense—the *Code* recognizes two mental state defenses: insanity and diminished capacity. As to insanity, the *Code* provides that "[a] person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong." *N.J.S.A.* 2C:4–1; *see generally State v. Winder,* 200 *N.J.* 231, 241–46, 979 *A.*2d 312 (2009) (describing history of and test for insanity defense). The burden of proving insanity rests with the defendant, *State v. Delibero,* 149 *N.J.* 90, 99, 692 *A.*2d 981 (1997), as "[i]nsanity is an affirmative defense which must be proved by a preponderance of the evidence." *N.J.S.A.* 2C:4–1. To be sure, even when the affirmative defense of insanity is interposed, the State remains "bound to prove every element of the offense charged beyond a reasonable doubt[ as t]hat burden cannot be shifted to a defendant, even

when a defendant is asserting an affirmative defense." *Delibero, supra,* 149 *N.J.* at 99, 692 *A.*2d 981 (citations omitted).

 Unlike the required insanity determination that a defendant must be unaware of the nature and quality of his acts or must be unable to distinguish between right and wrong, a diminished capacity defense has a different focus: it addresses the pinpointed attempt to "negate the presence of an essential mental element of the crime (as when, for example, a learning-disabled person strikes another but is unable to know that the blow could kill)." *Id.* at 98, 692 *A.*2d 981 (citing *State v. Breakiron,* 108 *N.J.* 591, 600–01, 532 *A.*2d 199 (1987)). As codified, the diminished capacity statute provides that "[e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense." *N.J.S.A.* 2C:4–2. It also provides, conversely, that "[i]n the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense." *Ibid.* That is so because, although "[a] jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime[,]" *Delibero, supra,* 149 *N.J.* at 98, 692 *A.*2d 981 (citing *State v. Harris,* 141 *N.J.* 525, 555, 662 *A.*2d 333 (1995)), "unless such evidence was introduced by the defendant, the State never ha[s] to address the issue in its proof of mens rea." Cannel, *supra,* Comment 1 on *N.J.S.A.* 2C:4–2.

 The line between insanity and diminished capacity is blurry, as "[t]hese terms are complex and their application has long troubled the law." *Delibero, supra,* 149 *N.J.* at 98, 692 *A.*2d 981 (citation omitted). As a practical matter, both an insanity defense and a diminished capacity defense must be triggered in the same fashion: "If a defendant intends to claim insanity pursuant to [*N.J.S.A.*] 2C:4–1 or the absence of a requisite state of mind pursuant to [*N.J.S.A.*] 2C:4–2, he shall serve notice of such intention upon the prosecuting attorney in accordance with the *Rules of Court.*" *N.J.S.A.* 2C:4–3. *See also R.* 3:12–1 ("A defen-

dant shall serve written notice on the prosecutor if the defendant intends to rely on any of the following sections of the Code of Criminal Justice: ... Insanity, [*N.J.S.A.*] 2C:4–1[ and] Lack of Requisite State of Mind, [*N.J.S.A.*] 2C:4–2[.]"). However, they differ in one fundamental respect: while the defendant bears the burden of proving the affirmative defense of insanity by a preponderance of the evidence, *Delibero, supra,* 149 *N.J.* at 99, 692 *A.*2d 981 (citing *Harris, supra,* 141 *N.J.* at 552, 662 *A.*2d 333), once raised, "the burden of proving beyond a reasonable doubt that defendant *was* capable of forming the necessary intent at the time of the [crime], despite the presence of mental disease or defect, always remain[s] on the State." *State v. Reyes,* 140 *N.J.* 344, 359, 658 *A.*2d 1218 (1995) (emphasis in original). As a result, "[o]ur courts no longer instruct the jury that a defendant asserts an affirmative defense when presenting evidence of diminished capacity." *Delibero, supra,* 149 *N.J.* at 101, 692 *A.*2d 981 (citing *Harris, supra,* 141 *N.J.* at 551, 662 *A.*2d 333). Even in those dissimilar circumstances, "evidence of the two concepts may overlap; facts adduced in support of one claim may be relevant to the other. When evidence relating to an affirmative defense also bears on the elements of an offense, the jury must be allowed to consider the evidence for that purpose as well." *Ibid.* (citations omitted).

The similarities and differences between insanity and diminished capacity inform and guide our analysis. We therefore now consider the standards that apply when a defendant eschews all defenses other than insanity yet later claims, for the first time on appeal, that the trial court remained obliged, on its own motion, to instruct the jury in respect of diminished capacity.

### B.

In determining whether, in a case tried solely on the issue of insanity, the trial court was under the separate duty to sua sponte charge the jury on diminished capacity, we stand on well-trod ground. In other, like contexts, this Court consistently has held

that a trial court's obligation to instruct the jury on the court's own motion arises "only when the evidence clearly indicates the appropriateness of such a charge[.]" *State v. Walker*, 203 *N.J.* 73, 87, 999 *A.*2d 450 (2010) (addressing whether trial court should instruct jury on statutory defense to felony murder in absence of request for charge from counsel); *see also State v. Denofa*, 187 *N.J.* 24, 41, 898 *A.*2d 523 (2006) (addressing whether trial court should instruct jury on territorial jurisdiction without request from counsel, and stating that "[i]n setting standards for when the trial court must charge the jury on territorial jurisdiction, we find an apt paradigm in our lesser-included-offense jurisprudence"); *State v. Robinson*, 136 *N.J.* 476, 489, 643 *A.*2d 591 (1994) (addressing whether trial court should instruct jury on lesser-included offense of attempted passion/provocation manslaughter without defense request). In the substantively similar context of lesser-included offenses, *State v. Thomas* states the operative rule:

even in the absence of a request, ... a trial court has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense. Conversely, a trial court has no duty to instruct the jury sua sponte on an included offense charge if the evidence does not clearly indicate or warrant such a charge. [187 *N.J.* 119, 132, 900 *A.*2d 797 (2006) (citations, internal quotation marks and editing marks omitted).]

The lesson derived from those authorities is straightforward: a trial court's duty to charge the jury on its own motion is one that is not self-executing, and that duty arises only when the record evidence clearly indicates the need for or clearly warrants the unrequested jury instruction.[8] *See State v. Choice*, 98 *N.J.* 295, 299, 486 *A.*2d 833 (1985) ("It is only when the facts 'clearly indicate' the appropriateness of th[e jury] charge that the duty of the trial court arises."). In determining whether an unrequested

---

[8] The clarity of the proofs needed to trigger a sua sponte jury instruction is well-illustrated in this case. Defendant stood charged of first-degree knowing and purposeful murder. Because it was clearly indicated by the evidence presented, and without the need for a request, the trial court properly and correctly also instructed the jury on the lesser-included offenses of passion/provocation murder and aggravated manslaughter.

jury charge should be given, the notion that the facts must " 'clearly indicate' the appropriateness" of the jury instruction is paramount: " 'The trial court does not have the obligation on its own meticulously to sift through the entire record in every trial to see if some combination of facts and inferences might rationally sustain a[n unrequested] charge.' " *Thomas, supra,* 187 *N.J.* at 134, 900 *A.*2d 797 (quoting *Choice, supra,* 98 *N.J.* at 299, 486 *A.*2d 833; editing marks omitted).

■ As with its cognitively similar application to statutory affirmative defenses, *Walker, supra,* or jurisdictional defenses, *Denofa, supra,* the overarching principle remains the same. We therefore hold that a trial court's sua sponte obligation to instruct the jury in respect of any defense—whether affirmative or tailored to negate an element of the offense—is triggered only when the evidence clearly indicates or clearly warrants such a charge, and that the trial court is not called on to scour the record in detail to find such support. In sum, we see no reason to depart from those well-founded and oft-applied principles simply due to a slight contextual difference.

Having defined the operative principle in this appeal, we turn to its application.

## C.

■ Dr. Latimer testified solely and exclusively in respect of his opinion that defendant was insane at the time that he killed his wife. That trial strategy was understandable: given the gruesome nature of this crime and the staggering amount of evidence piled against defendant, it is natural to recoil at the thought that someone other than one who truly is unaware of the nature and quality of his acts or is otherwise unable to distinguish right from wrong could have acted so unspeakably. Yet the jury, having heard all of the evidence—including Dr. Latimer's testimony and the rebuttal testimony of the State's psychiatrist—and having been instructed properly by the trial court, rejected defendant's

insanity defense and adjudged him criminally responsible for his behavior.

Defendant's single-minded trial focus on his insanity defense was not the product of happenstance. The record makes clear that the entirety of his defense was that he could not be held criminally liable because he suffered from a brief psychotic disorder that absolved him of the consequences of his acts; that defense was tendered to counteract the overwhelming quantum and quality of proof of guilt arrayed against him. No doubt, as defendant claims on appeal, the record does contain Dr. Latimer's scattered observations that, based on his conversations with defendant, defendant's "mind [was] not there[,]" that Dr. Latimer did not think that defendant knew what he was doing, and that defendant could not think. However, in the context of an insanity defense—where defendant is required to prove by a preponderance of the evidence that "he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong[,]" *N.J.S.A.* 2C:4–1—those disjointed proofs, standing alone, do not "clearly indicate" or clearly warrant the conclusion that defendant likewise "suffered from a mental disease or defect . . . relevant to prove that [he] did not have a state of mind which is an element of the offense." *N.J.S.A.* 2C:4–2.

If defendant intended to present a diminished capacity defense, he presumably would have given notice of that intent to the State, as required by both the applicable statute and *Court Rules. See N.J.S.A.* 2C:4–3(a); *R.* 3:12–1. Additionally, defendant would have had to question Dr. Latimer on the subject of diminished capacity in order to lay a basis for the defense. It is clear from the record that defendant chose, for whatever reasons, to eschew a diminished capacity defense. In the absence of competent psychiatric testimony supporting that defense, it is difficult to see how a charge on the subject ever would be clearly indicated.

Therefore, unlike the Appellate Division, we conclude that, even if the record on appeal is scoured—an obligation specifically disclaimed and rejected—a diminished capacity charge was not clearly indicated or clearly warranted by the record evidence. Thus, the failure to give such a charge on the trial court's own motion was not error, much less plain error. Based on that conclusion, to the extent the Appellate Division's opinion reasons differently, it is modified to conform with the conclusion we have reached.[9]

## IV.

As modified, the judgment of the Appellate Division affirming defendant's conviction and sentence is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, HOENS and Judge STERN (temporarily assigned)—7.

*Opposed*—None.

---

[9] In his supplemental brief to this Court, defendant repeated a claim he had advanced before the Appellate Division: that the trial court impermissibly allowed Ana's son to testify concerning his and his sister's dislike of defendant. He claims that those proofs violated the proscription against proof of "prior bad acts" as codified by *N.J.R.E.* 404(b). The Appellate Division rejected that argument, reasoning that, although the testimony likely should not have been allowed, "the error was harmless" because "in view of the overwhelming evidence of defendant's guilt, the admission of [the challenged] comment was not 'clearly capable of producing an unjust result[.]' *R.* 2:10–2."

We need not express a separate view on defendant's contention that the challenged comment constituted proof of a prior bad act interdicted by *N.J.R.E.* 404(b); it suffices that the final determination reached by the Appellate Division on this point—that defendant was not wrongly harmed by the admission of the challenged statement—is and remains unassailable. Likewise, for the reasons

---

fully explored by the Appellate Division, there is no merit in defendant's claim that his sentence was excessive.