**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5531-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

NYFEE MALLORY,

     Defendant-Appellant.

_____

Argued January 28, 2019 – Decided February 8, 2019

Before Judges Sabatino and Haas.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 13-05-0438.

Susan Brody, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Susan Brody, of counsel and on the brief).

Michele C. Buckley, Special Deputy Attorney General/ Special Assistant Prosecutor, argued the cause for respondent (Michael A. Monahan, Acting Union County Prosecutor, attorney; Michele C. Buckley, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A Union County grand jury charged defendant Nyfee Mallory, and his two co-defendants, Derrick Dunn and Corey Winston, in a four-count indictment with first-degree robbery, N.J.S.A. 2C:15-1 (count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four). The trial judge later granted defendants' motion to sever their cases, and thereafter denied defendant's motion to suppress the statements he gave to police concerning his involvement in the offenses.

Following a multi-day trial, the jury convicted defendant on counts one and two, and acquitted him on both weapons charges. After merging count one into count two, the judge sentenced defendant to a thirty-five-year term on count two, with a thirty-year period of parole ineligibility. This appeal followed.

On appeal, defendant raises the following contentions:

> POINT I
>
> THE TRIAL JUDGE'S ERROR IN FAILING TO INSTRUCT THE JURY SUA SPONTE AS TO THE AFFIRMATIVE DEFENSE TO FELONY MURDER DEPRIVED DEFENDANT OF HIS

2

CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. CONST. [AMENDS.] VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10. (Not Raised Below).

POINT II

DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE JUDGE'S INSTRUCTION REPEATEDLY REFERRING TO A FLAWED AND MISLEADING EXAMPLE OF ACCOMPLICE LIABILITY HE HAD DEVISED, WHICH HAD BEEN FOUND BY THIS COURT TO BE INACCURATE IN A PREVIOUS CASE OVER WHICH HE HAD PRESIDED. U.S. CONST. [AMENDS.] VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10. (Not Raised Below).

POINT III

DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN THE TRIAL COURT FAILED TO EXCLUDE AN AUDIOTAPE THAT WAS OF MINIMAL EXCULPATORY VALUE AND NECESSARILY CREATED A DEVASTATINGLY PREJUDICIAL IMPACT. U.S. CONST. [AMENDS.] VI, XIV; N.J. CONST. ART. 1, PARS. 1, 9, 10. (Not Raised Below).

In addition, defendant argues in his pro se supplemental brief for the first time on appeal that "the trial court's charge on accomplice liability was deficient because it was not tied to the facts of the case."

After reviewing the record in light of the contentions advanced on appeal, we affirm.

I.

On the morning of February 20, 2012, a group of men were playing soccer on a field in a public park. One of the players, Felipe Rojas, noticed three young men cross over the bridge from the school across the street, and approach a concession stand by the field. Rojas testified that the men were dressed in black. One of the men, who was wearing pink gloves, began doing push-ups.

Rojas later saw that a fourth man had joined the group. Rojas soon heard a loud "bang," which he believed was the sound of a garbage can falling over. However, he noticed that one of the men was laying on the ground, and the other three men were running away. The victim got up, and Rojas saw that he was bleeding from the neck. Rojas testified that the victim began walking in an unstable manner before falling to the ground near a goalpost.

At approximately 10:50 a.m., a Roselle police officer received a report of shots being fired near the soccer field. When he arrived at the scene, he found the victim lying on the ground, motionless and unresponsive. The victim was surrounded by soccer players, who were trying to administer first aid. The officer called for emergency assistance. While the victim was being treated, the

4

police recovered his cell phone and twenty-one bags of marijuana he was carrying from the ambulance. The efforts to revive the victim were unsuccessful, and the medical examiner testified that his death was caused by a single gunshot wound to the left side of his neck, which severed his left and right carotid arteries and his left jugular vein.

Other police arrived and tracked the victim's trail of blood from where they found him on the soccer field, to a larger pool of blood near the concession stand. There, the police found a .45 caliber shell casing.

Another police officer was in the area when the shooting report was received. He saw two men, dressed all in black, who matched descriptions given by witnesses, and who appeared to have just stopped running. The officer detained the men, who were later identified as co-defendants Dunn and Winston. Dunn was carrying pink gloves. The police later released the two men.

Later that night, the police recovered a loaded .45 caliber handgun from under a shrub near the door of a nearby house. Ballistics analysis confirmed that the .45 cartridge found near the concession stand was fired from the gun. There were no fingerprints on the gun, but it contained a mix of DNA. Dunn was identified as a major contributor to this mix, while defendant and Winston were excluded as possible contributors.

A-5531-16T4

The police also recovered a jacket that a woman found on the playground area of a school that was across the street from the field. The jacket had a recognizable "DX" marking on it, and defendant later acknowledged that it belonged to him. In addition, based upon DNA testing, defendant could not be excluded as a possible contributor to the DNA found on the jacket, while Dunn and Winston were excluded as possible contributors.

Two days after the murder, defendant and his father voluntarily appeared at police headquarters. Defendant told the police there was a false rumor going around at his school that he was involved in the shooting, and he wanted to set the record straight. The police transported defendant to the prosecutor's office,[1] and gave defendant his Miranda[2] rights. Defendant proceeded to make two statements concerning the incident.

In the first statement, defendant admitted he met with Dunn and Winston on the morning of February 20, but he denied being involved in the murder. Defendant stated that he, Dunn, and Winston planned to pool their money to buy marijuana from the victim. Defendant first went to Winston's house, and the

---

[1] Defendant's father did not accompany him to the prosecutor's office and, although he went there separately later in the day, he did not see his son again that day.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

two men walked to a street corner where they met Dunn. The group bought a cigar in a store, and walked down the street smoking it, and then smoking marijuana.

Dunn asked defendant to borrow his phone, and defendant gave it to him. Dunn walked away and spoke to someone on the phone as he paced back and forth between two streets. Defendant retrieved his phone, and walked home. Defendant told the police he stayed at home for about thirty minutes before leaving to pick up his girlfriend. He claimed that he and his girlfriend spent the day in Jersey City. While there, a friend named Neil Bailey called and told defendant that the police were questioning people. Another friend called and told defendant that the victim had been shot and killed.

When defendant learned that Dunn and Winston had been released by the police, defendant said he tried to call them, but they did not answer their phones. He confirmed that Dunn had a pair of pink gloves, but said he did not know if Dunn was wearing them on the day of the murder.

After defendant completed his statement, the detectives arrested him. While the detectives were preparing the complaints, defendant asked to make another statement, and the detectives again gave defendant his Miranda warnings.

In this statement, defendant admitted to being involved in the incident at the soccer field. Defendant told the detectives that on the morning of February 20, he exchanged a number of calls and text messages with Dunn and Winston. During these discussions, Dunn told defendant and Winston that they needed to do "a come up," which defendant explained was a way to get money, such as by robbing someone. The group decided to rob a marijuana dealer of whatever money and drugs he might be carrying.

Defendant walked to Winston's house, and the two men soon went to meet Dunn. Winston and Dunn were wearing black clothes. Defendant wore his "DX" jacket. When Dunn arrived, he told them he had "the strap," which was a term the men used to refer to a gun. Dunn also showed them the handgun. Dunn stated he was going to use the gun to get "the come up." Defendant knew this gun was a .45 caliber pistol because he and Dunn had picked it up in Newark only two weeks earlier. Defendant stored the gun and bullets in a cloth bag near a garbage can in his backyard, and Dunn also had access to it.

Defendant told the detectives that Dunn had drawn the gun and pointed it at a crowd during a party a few nights before the murder. Later that same night, defendant was driving his father's car with Dunn in the passenger seat. Dunn told defendant to follow another man's car. Defendant pulled up next to the car

and Dunn took out the gun and pointed it at the occupants in the other car, who ducked as defendant drove away. Defendant also told the detectives that Dunn had used the gun in robberies on two separate occasions prior to the murder.

Dunn took defendant's phone and used it to call the victim on the speakerphone so all three men could listen in.[3] Defendant stated that Dunn used his phone because they did not want the victim to know it was Dunn who was calling. Dunn gave the victim the name of another person who was known to smoke marijuana when the victim answered the phone. Dunn told the victim he wanted to buy twenty-one bags of marijuana, and also asked the victim to bring cash for change. The victim did not have any cash, but agreed to bring the marijuana to the park to complete the transaction.

Defendant stated that the men planned to take two bags each of marijuana to smoke, and then sell the rest. They later decided that each of them would get seven bags.

Winston and Dunn were wearing black clothes. Defendant wore his "DX" jacket. Because Dunn's jacket was even more distinctive, defendant stated he gave his jacket to Dunn to wear so the victim would not recognize him from a

---

[3] The police obtained the records of these calls from defendant's cellphone and the State introduced this evidence at the trial.

distance. Based upon Dunn's reputation, the group was afraid the victim would not approach them if he knew Dunn was involved in the deal.

Defendant, Dunn, and Winston went to the park and hid near the concession stand. As the victim approached, he recognized Dunn and realized he was going to be robbed. The victim turned to get away, but defendant told the detectives that Dunn shot the victim in the neck. Defendant then ran home, and Dunn and Winston ran away as well. Defendant told the detectives that he had lied to the police during his first statement because he was afraid he might be killed if he implicated Dunn in the murder.

Once he got home, defendant called Bailey a number of times before his friend finally answered. Bailey testified that he lived near the park, and defendant asked him to look out the window and let him know what was happening. Defendant later told Bailey not to tell anyone that he had called him on the day of the murder.

Defendant did not testify at the trial. He called his father as his only witness. Defendant's father stated that defendant left the house around 9:30 a.m. on the morning of the murder, and returned between 10:00 a.m. or 10:30 a.m., looking "happy," and asked to borrow the car to pick up his girlfriend.

Defendant's father believed his son left the house again around 11:00 a.m., although he admitted he was not paying attention to the time.

## II.

In Point I of his brief, defendant argues that the trial judge erred in failing to sua sponte charge the statutory defense to felony murder, N.J.S.A. 2C:11-3(a)(3). Because defendant did not raise this issue at trial, we review it for plain error. State v. Walker, 203 N.J. 73, 89 (2010) (citing R. 2:10-2). To warrant reversal, the error must be "clearly capable of producing an unjust result." Ibid. "The error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'" Id. at 90 (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Applying this standard, we reject defendant's contention.

N.J.S.A. 2C:11-3(a)(3) is an affirmative defense to felony murder. State v. Martin, 119 N.J. 2, 22-23 (1990). In pertinent part, the statutory defense provides as follows:

> (a) Except as provided in [N.J.S.A.] 2C:11-4, criminal homicide constitutes murder when:
>
> (3) It is committed when the actor, acting either alone or with one or more persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, . . . and in the course of such crime or immediate flight

therefrom, any person causes the death of a person other than one of the participants; except that in any prosecution under this subsection, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a)  Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(b)  Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

(c)  Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d)  Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

[N.J.S.A. 2C:11-3(a)(3).]

These four prongs, which must all be met for the statutory defense to apply, "focus on whether the accomplice undertook a homicidal risk or could have foreseen that the commission of the felony might result in death." Walker, 203 N.J. at 84 (quoting Martin, 119 N.J. at 22-23).

In order to amount to plain error, a defendant who fails to request a charge on a defense must demonstrate that it was clearly indicated by the evidence. Id.

at 87. The court is not required "to sift through the entire record in every trial to see if some combination of facts and inferences rationally sustain a[n unrequested] charge." State v. Rivera, 205 N.J. 472, 490 (2011) (alteration in original) (internal quotation marks omitted) (quoting State v. Thomas, 187 N.J. 119, 134 (2006)). Instead, the need for the charge must "jump off" the proverbial page. State v. Denofa, 187 N.J. 24, 42 (2006).

Thus, a "[d]efendant ha[s] the burden to produce some evidence in support of each prong of the defense, irrespective of whether there was strong evidence to the contrary." Walker, 203 N.J. at 87; see also State v. Smith, 322 N.J. Super. 385, 396-97 (App. Div. 1999) (holding that the defendant must present some evidence supporting all four factors of N.J.S.A. 2C:11-3(a)(3)). When the defendant satisfies this obligation, the burden then shifts to the State to disprove the defense beyond a reasonable doubt. N.J.S.A. 2C:1-13(b)(1)-(2); see also Smith, 322 N.J. Super. at 398.

Defendant did not meet his burden of production in this case. Although defendant's trial theory was that he was not involved in the robbery or murder, and was not even present during the offense, he did not present any evidence to support this theory, or any evidence that would satisfy the four prongs of the

statutory defense set forth in N.J.S.A. 2C:11-3(a)(3). Instead, there was significant evidence to the contrary.

Specifically, defendant told the detectives that he, Dunn, and Winston devised the plan together to "come up" with money by robbing the victim. The three men also planned how to divide any money or drugs taken from the victim after the robbery. Defendant's phone was used to set up the victim, and defendant gave Dunn his coat so the victim would not immediately recognize him. The State also produced witnesses who placed three men at the scene with the victim before the murder.

While there is evidence in the record that Dunn was the shooter, this only provided support for factors N.J.S.A. 2C:11-3(a)(3)(a) and (b). There was no evidence supporting factors N.J.S.A. 2C:11-3(a)(3)(c) and (d). Defendant told the detectives throughout the interview that he knew Dunn was carrying the handgun, which the two had obtained in Newark just a couple of weeks before the robbery. Dunn also told defendant and Winston prior to the murder that he intended to use the weapon "to get the come up." In addition, defendant knew from personal experience that Dunn was using the gun in the days before the murder to rob and scare a number of different individuals.

Under these circumstances, we cannot conclude that defendant had no reasonable ground to believe that Dunn was armed with a weapon under N.J.S.A. 2C:11-3(a)(3)(c), and no reasonable ground to believe that Dunn intended to engage in conduct likely to result in the victim's death or serious physical injury. Because the facts did not clearly indicate the appropriateness of charging the statutory defense, the judge did not commit plain error by failing to instruct the jury concerning it.

## III.

In Point II of his counseled brief, and in the only point raised in his pro se supplemental brief, defendant argues that the judge gave "a flawed and misleading example of accomplice liability" during his final charge to the jury and in response to the jury's subsequent questions about this concept. This argument stands in stark contrast to defense counsel's statement during the charge conference that the example would "make it easier for the jury to understand accomplice liability." Because there was no objection to the court's instruction at trial, we review the claimed error under the plain error standard.

15

<u>R.</u> 2:10-2. For the following reasons, we conclude that defendant's contentions on this point lack merit.[4]

It is well settled that "[a]ppropriate and proper charges are essential for a fair trial." <u>State v. Baum</u>, 224 N.J. 147, 158-59 (2016) (alteration in original) (internal quotation marks omitted) (quoting <u>State v. Reddish</u>, 181 N.J. 553, 613 (2004)). Jury instructions must give a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." <u>Id.</u> at 159 (quoting <u>State v. Green</u>, 86 N.J. 281, 287-88 (1981)).

"A trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it." <u>State v. Funderburg</u>, 225 N.J. 66, 80 (2016) (citing <u>State v. Ernst</u>, 32 N.J. 567, 583-84 (1960)). To

---

[4] Citing two unreported opinions, defendant asserts that other panels of this court have found the judge's example to be "inaccurate." We cite these unpublished opinions only for context to address defendant's arguments, and not as precedential authority. <u>See</u> <u>R.</u> 1:36-3. In the first of these cases, <u>State v. Merrett</u>, No. A-5443-07 (App. Div. Feb. 10, 2011), it is not clear whether the judge's example was used because it is not quoted in the opinion. In any event, the panel held that looking at the charge as a whole, the judge "thoroughly and correctly instructed the jury on the elements of accomplice liability[,]" even though the panel agreed that the judge's example "might have been better phrased[.]" (slip op. at 25). Similarly, in <u>State v. Green</u>, No. A-0680-09 (App. Div. June 27, 2012), the panel concluded that taken as a whole, the instruction passed muster under a plain error standard. (slip op. at 10-11).

assess the soundness of the jury instruction, we consider "how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary . . . jurors understand the instructions as a whole." State v. Savage, 172 N.J. 374, 387 (2002) (alteration in original) (internal quotation marks omitted) (quoting Crego v. Carp, 295 N.J. Super. 565, 573 (App. Div. 1996)).

Applying these principles, we discern no grounds for concluding that the judge's instruction on accomplice liability, including the example he used to illustrate the charge, was defective as a matter of plain error. Under N.J.S.A. 2C:2-6(c),

> A person is an accomplice of another person in the commission of an offense if:
>
> (1) With the purpose of promoting or facilitating the commission of the offense; he [or she]
>
> (a) Solicits such other person to commit it;
>
> (b) Aids or agrees or attempts to aid such other person in planning or committing it; or
>
> (c) Having a legal duty to prevent the commission of the offense, fails to make proper effort so to do; or
>
> (2) His [or her] conduct is expressly declared by law to establish his complicity.

"[A] jury must be instructed that to find a defendant guilty of a crime under a theory of accomplice liability, it must find that he 'shared in the intent

which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.'" State v. Bielkiewicz, 267 N.J. Super. 520, 528 (App. Div. 1993) (quoting State v. Fair, 45 N.J. 77, 95 (1965)). Here, the accomplice liability charge applied to the charge of robbery. A person is guilty of robbery if, in the course of committing a theft, he:

> (1) Inflicts bodily injury or uses force upon another; or
>
> (2) Threatens another immediately to commit any crime of the first or second degree.
>
> An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.
>
> [N.J.S.A. 2C:15-1(a).]

In addition to instructing the jury on these principles, the judge provided the following example to the jury while discussing accomplice liability:

> Before I give you the definition and elements of accomplice liability, I would like to begin with an example to help you in understanding this concept.
>
> A friend comes by your house to pick you up and says:
>
> Hey, do me a favor.
>
> Will you drive my car?

I have to go to the bank and make a withdrawal and I don't want to pull the car into the lot because it is hard to find a parking space. It is a busy street, so just stay in the no-parking zone in the front of the bank and this way when I come out, I can just jump into the car and leave. It will save me a lot of time.

You agree.

You drive the car to the bank, pull up in front and leave the engine running while your friend goes into the bank. While you are sitting in the car, your friend comes running out of the bank, jumps into the car and says, Okay, let's go.

You are driving down the street and suddenly police cars are coming at you from every direction. You pull over and the police order you out of the car.

You explain: Wait a minute officer. I didn't do anything. What are you doing?

The police say, Your friend has robbed the bank. The withdrawal that you thought your friend was making was really a bank robbery, but you did not know it.

In this example, you are not an accomplice. You are not an accomplice because you did not share the purpose to commit the crime. Even though you were present and involved, you did not have the purpose to commit that specific crime. You cannot be held responsible for the actions of the other person who committed the bank robbery.

A-5531-16T4

The judge continued his instructions by modifying the facts in his first example to give the jury an example of a situation where the defendant would be guilty of robbery under accomplice liability. The judge stated:

> In the second example, I will alter the facts slightly.
>
> Your friend calls you on the phone and says: I need a ride to the bank. I have to make a withdrawal.
>
> As you pull up to the front of the bank with your friend, he pulls out a gun and says, I'll be right back. I'm going in to rob the bank. You see the gun and you now realize he is not making a withdrawal, he is going to rob the bank. You sit and wait in the car for him to return and you assist him in the get-away.
>
> In this example, you have now shared the purpose for him to commit the act, you knew he had the gun and he told you he was going to rob the bank. You assisted him or aided him in committing the crime. You did this by waiting for him outside the bank and then driving him away. You did all of this with the purpose that the crime of robbing the bank be committed. You shared the purpose for him to commit the crime. You are, therefore, an accomplice.
>
> The difference between the two examples is the phrase "share the purpose to commit the crime."

Defendant did not object to this charge when the judge gave it to the jury. For the first time on appeal, he now argues that the charge, and the other references to the two examples the judge made in his instructions, were defective

20                                                                                    A-5531-16T4

because "[n]owhere in the second part of the example is the alleged accomplice's purpose even mentioned; the only state of mind mentioned in the factual hypothesis is one of knowing what the principal intends." We disagree.

Shortly after giving the jury the examples set forth above, the judge specifically instructed the jury that it should only convict defendant under accomplice liability if he had the requisite mental state. The judge explained:

> Remember that this [d]efendant can be held to be an accomplice with equal responsibility only if you find beyond a reasonable doubt that he possessed the criminal state of mind that is required to be proven against the person who actually committed the criminal acts.
>
> In order to convict the [d]efendant as an accomplice to the crime of first-degree robbery, you must find that the [d]efendant had the purpose to participate in the first-degree robbery. He must act with the purpose of promoting or facilitating the commission of that substantive crime.
>
> It is not sufficient to prove only that the [d]efendant had knowledge that another person was going to commit the crime charged. The State must prove that it was [d]efendant's conscious object that the specific conduct charged be committed.
>
> To reiterate, the elements of accomplice liability are:
>
> One, that an offense was committed.

A-5531-16T4

Two, that this [d]efendant did solicit, aid, agree to aid, or attempt to aid another in committing or planning the offense.

Three, that this [d]efendant's purpose was to promote or facilitate the commission of the offense.

Four, that this [d]efendant possessed the criminal state of mind that is required to be proven against the person who actually committed the criminal act.

During its deliberations, the jury asked the judge to further explain the example he included in the final charge. In his response to this inquiry, the judge again told the jurors that in order to find an accomplice liable for the conduct of another in the bank robbery example, the jury would have to conclude that the accomplice and the principal both had the state of mind necessary to support a conviction for that offense. In addition, the judge instructed the jurors to look at the accomplice charge in its entirety. Defendant's attorney stated that he agreed with the judge's answer to the jury's question.

As noted above, "in reviewing any claim of error relating to a jury charge, the 'charge must be read as a whole in determining whether there was any error[.]'" State v. Gonzalez, 444 N.J. Super. 62, 70-71 (App. Div. 2016) (quoting State v. Torres, 183 N.J. 554, 564 (2005)). Applying this rule, we are satisfied that the additional instructions to the jury following the example made clear to the jury that mere awareness that another person will commit a crime, without

the specific intent that the crime be committed, will not suffice for accomplice liability. The judge's example did not adequately address the required mental state, but any confusion that might have been caused was immediately clarified through the additional instructions. Reading the charge as a whole, we detect no error that was clearly capable of producing an unjust result. R. 2:10-2. Therefore, we reject defendant's arguments on this point.

IV.

Finally, defendant argues in Point III that the trial judge should have conducted a sua sponte hearing under Rule 104 in order to determine whether a strategic decision made by defense counsel was unduly prejudicial. We decline defendant's invitation to second-guess counsel's decision for the first time on appeal. R. 2:10-2.

While cross-examining the detective who took defendant's statements at the prosecutor's office, defense counsel advised the judge that he intended to introduce an audiotape of Dunn speaking to another person about the robbery.[5] In the tape, Dunn stated that: he and Winston were not involved in the robbery; defendant was the one who shot the victim; and the other participant in the

---

[5] This tape was made by the other individual's mother, who recorded it while Dunn was talking to her son at their front door.

conversation should tell everyone in town Dunn and Winston "had nothing to do with" it.

The judge asked the prosecutor if he had any objection, and the prosecutor replied in the negative. The judge called a sidebar and, after ascertaining the content of the tape,[6] asked defense counsel, "You want this in?" Defense counsel replied, "Oh yeah. It sounds strange, but yes." Counsel explained that playing the tape would demonstrate why defendant made the decision to speak to the police to clear his name because it showed that there were false rumors started by Dunn and Winston going around about his possible involvement in the murder.[7]

Defense counsel then played the tape.[8] In addition to stating that defendant was the shooter, Dunn also claimed during the tape that he tried to grab the victim after he was shot in order to help him. By cross-examining the detective, and showing him a photo of Dunn after he was arrested, counsel was

---

[6] The tape was approximately 100 seconds in length.

[7] In his final argument to the jury, counsel repeated this argument, and also asserted that it showed that Dunn had attempted to shift the blame to his client almost immediately by "making up a story."

[8] The tape was marked for identification before it was played, but it was not admitted in evidence.

 A-5531-16T4

able to attack Dunn's credibility by establishing that although the victim was bleeding profusely, Dunn did not have any blood on him when he was caught by the police.

Defendant now argues that the judge was obligated to conduct a hearing to determine whether the "minimal exculpatory value" of the tape was outweighed by the prejudice he may have suffered from having Dunn's statement that defendant was the shooter heard by the jury. We disagree.

Our Supreme Court has long recognized that a defendant generally has a right to defend a case as he or she sees fit. Thus, "[t]rial courts must carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal." State v. Perry, 124 N.J. 128, 162 (1991). Put another way,

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

25

[Strickland v. Washington, 466 U.S. 668, 689 (1984) (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).]

Following these principles, we discern no plain error under the circumstances of this case. The tape was relevant to defendant's defense that he was wrongly implicated by Dunn and Winston who were spreading false rumors about him in an attempt to avoid blame themselves. While other attorneys might have made a different tactical decision, defense counsel provided an explanation for his strategy when questioned by the judge. Thus, the judge correctly refrained from preempting defense counsel's strategic and tactical decision. Perry, 124 N.J. at 162.

V.

In sum, we affirm defendant's convictions and sentence.[9]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] As for the balance of any of defendant's arguments not expressly discussed above, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).