NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1320-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHELLE PADEN-BATTLE,
a/k/a MICHELLE A. PADEN,
MAMA MICHELLE,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **June 16, 2020**
>
> **APPELLATE DIVISION**

Argued telephonically May 21, 2020[1] –
Decided June 16, 2020

Before Judges Fisher, Accurso and Gilson.

On appeal from the Superior Court of New Jersey, Law
Division, Essex County, Indictment No. 15-03-0584.

Tamar Yael Lerer, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; Monique D. Moyse,
Designated Counsel, on the brief).

---

[1] The matter had originally been listed in January 2020 for disposition on the written submissions since neither party requested oral argument. The court sua sponte rescheduled the matter for oral argument and invited the Attorney General and the American Civil Liberties Union of New Jersey to participate as amici curiae in light of the troubling issue posed in defendant's third point. Both accepted our invitation; we are grateful for their involvement.

Emily M.M. Pirro, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Emily M.M. Pirro, of counsel and on the brief).

Sarah D. Brigham, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Sarah D. Brigham, of counsel and on the brief).

Alexander R. Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander R. Shalom, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

At the conclusion of an eight-day trial, a jury convicted defendant Michelle Paden-Battle of kidnapping Regina Baker, conspiracy to commit kidnapping, and felony murder. The jury acquitted defendant of Baker's murder, as well as conspiracy to commit murder and two weapons offenses, but the judge enhanced defendant's sentence because he determined that defendant "ordered" Baker's "execution."

In this appeal, defendant argues that: (1) the judge's instructions on the kidnapping charge were erroneous and that she was prejudiced by the judge's

2                                                                    A-1320-17T4

repeated reference in his jury charge to other participants as defendant's "kidnapping co-conspirators"; (2) the judge failed to charge either the affirmative defense of duress, N.J.S.A. 2C:2-9, or the felony-murder affirmative defense described in N.J.S.A. 2C:11-3(a)(3); and (3) the judge imposed an excessive sentence. We agree that the jury verdict did not allow the judge to sentence defendant as if she was convicted of first-degree kidnapping and that the verdict should have been molded to reflect a conviction of second-degree kidnapping. We otherwise affirm the convictions, but we remand for resentencing not only because the judge sentenced defendant as if she had been convicted of first-degree kidnapping, but also because he based his sentence on the facts as he found them, instead of the facts found by the jury.

To understand our disposition, it is necessary to consider the factual record. The jury heard testimony that at 4:30 a.m., on June 19, 2012, Essex County detectives received instructions to process a homicide in a structure on 15th Street in Newark. In that vacant residence, police discovered the body of a deceased female. Jersey City Police Department detectives soon arrived to ascertain whether the deceased female was Baker, the victim of an alleged kidnapping that had occurred at approximately 10:15 p.m., on June 16, 2012, on Bidwell Avenue in Jersey City. The Jersey City detectives advised their Essex

County colleagues that they had obtained a surveillance video, which appeared to show the kidnapping on Bidwell Avenue. The victim found in Newark was identified as Baker through fingerprint analysis.

During the investigation on 15th Street, a statement was taken from a woman in the area of Ocean and Bayview Avenues in Jersey City sometime after 9:00 p.m., on June 16, 2012, who was approached by four females and three males looking for Regina Baker. This woman provided Essex County detectives with a description of the seven individuals, one of whom was Omar Martin. Defendant was also identified as one of the seven.

Meanwhile, Jersey City detectives identified one of the females present during the kidnapping depicted on the video as Davia Younger, who was then arrested and charged with kidnapping and conspiracy to commit kidnapping. Younger gave a statement that Karon Adams admitted to her that he shot and killed Baker. She also identified Adams' girlfriend, Frencheska DePena. All these individuals – Martin, Adams, DePena, and defendant – were arrested. Additional information led to the arrest of Damon Zengotita and Cierra Long.

Defendant and others were indicted. Defendant was charged with: second-degree conspiracy to commit kidnapping, N.J.S.A. 2C:5-2; first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1); first-degree conspiracy to commit murder,

N.J.S.A. 2C:5-2; first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); and first-degree criminal gang activity, N.J.S.A. 2C:33-29.[2]

Martin and Adams pleaded guilty to kidnapping, conspiracy to commit murder, aggravated manslaughter, and unlawful possession of a handgun, and were sentenced to twenty-year prison terms. Younger pleaded guilty to conspiracy to commit kidnapping and received a five-year prison term. Long pleaded guilty to conspiracy to commit kidnapping and was sentenced to a term of 135 days.

At trial, Long, Martin and Younger testified for the State. Defendant testified on her own behalf.

Long testified she was a member of the Mob Piru set of the Bloods. Defendant was known to her as "Mama L," a First Lady in the Looters[3] Park Piru set of the Bloods. According to Long, a First Lady is the highest rank that

---

[2]  This gang activity charge was later dismissed.

[3]  The transcript at times refers to "Looters" as "Lueders."

can be attained by a female member of the Bloods and that those beneath a First Lady are required to follow her commands.

Long lived with defendant at her home on Littleton Avenue in Newark. She testified about a call she received from defendant on the night in question, ordering her to return home and then go with defendant to Jersey City. Long overheard defendant arguing on the telephone with Baker, an alleged First Lady of the MOB Piru set of the Bloods in Jersey City. She also testified that Baker had been labeled "food," meaning other gang members are permitted to beat or kill that person so labeled. Baker was "food" because, in defendant's view, she had been falsely claiming she held a higher rank in the gang than in reality.

According to Long, when she arrived at the Littleton Avenue residence, defendant, DePena, and Adams were there; Martin and Zengotita soon arrived in the latter's car. They all rode together – after a stop to get a brake light fixed – to Jersey City. On the ride, defendant was on the phone, advising they were on the way to Jersey City to get Baker, that Baker was "food," and that defendant "wasn't going another day without handling the situation." Once in Jersey City, they received information that Baker was at Natassia Hernandez's residence on Bidwell Avenue. On arriving, Hernandez came out and defendant told her, "[g]o

get Rage,[4] tell her to come downstairs."  Baker stepped into the doorway, and defendant began to argue, telling Baker she was "here to fight you" and that Baker was going to come back with them to Newark.

During the argument, Martin "got in [Baker's] face" and then walked to the corner where Long saw Adams give Martin a gun.  Martin then returned and held the gun to Baker's head while he and Adams pulled Baker toward Zengotita's car to force her into the trunk.  Baker resisted and Martin hit her in the face with the gun and, along with DePena and Younger, Martin and Adams forced Baker into the trunk.  They all then entered the vehicle and drove off.

According to Long, during the ride from Jersey City to Newark, defendant realized that Baker might have had a phone in her possession, so they stopped the car along a nearby waterway; defendant Martin, who was still armed, got out of the car to retrieve Baker's phone.  Baker handed her phone to defendant, who threw it in the nearby river.  The group then resumed their trip to Newark.  Once there, the car stopped at defendant's residence, where defendant, Long, Younger, and DePena exited and then walked to the Ville, the location where Martin, Adams and Zengotita had brought Baker and were displaying her to others.  Long overheard defendant say to Martin and Adams, "[y]ou know what y'all got

---

4  Baker's nickname.

to do," which Long understood as an instruction for Martin and Adams to kill Baker.

Long testified that she, defendant, DePena, and Younger returned to defendant's residence where defendant said to them, "[t]his could be any one of y'all." Later, Martin and Adams arrived and told defendant, "it's done." Defendant asked who shot Baker, and Adams admitted he did.

Martin testified as well, acknowledging that he held a rank equal to defendant's First Lady rank. Two days before the killing, he was told that defendant wanted to speak to him, so he and Zengotita went to defendant's residence – Long, Adams, DePena, and defendant were already there – and found that defendant was angry and talking about a dispute on Facebook in which Baker was falsely claiming her gang status. Defendant expressed her plan to go to Jersey City and bring Baker back to Newark. She asked Martin for a gun, so he left one at her residence.

Martin also testified that on June 16, he, Long, DePena, Adams and Zengotita met defendant at her Newark residence, drove first to get a brake light fixed, and then traveled to Jersey City, where they looked for Baker; they then also met up with Younger and another. They learned Baker was at Hernandez's residence on Bidwell Avenue and drove there.

Martin testified that during defendant's encounter with Baker on Bidwell Avenue, he felt "they [were] taking [too] long to handle the situation," so he retrieved the gun, held it to Baker's head, and when she further resisted, he hit her on the head with the gun, following which he and Adams forced Baker into the trunk. He also corroborated what Long said about the ride to Newark, including the stop on the way, although he testified that he and not defendant took the phone from Baker and threw it over a fence into the river.

Martin also testified that, after dropping off defendant, Long, DePena, and Younger at defendant's residence, they drove to the Ville, where they opened the trunk to show Baker to others. When defendant and the other women arrived, defendant told Martin and Adams to "handle the situation," which Martin understood as an instruction to kill Baker. Martin, Adams, and Zengotita then drove the vehicle to an abandoned building on 15th Street. Martin testified that he saw Adams take Baker out of the trunk and bring her inside. Baker asked that they not kill her and to tell her kids she loved them. While waiting outside, Martin heard the sound of three gunshots inside. After, Adams, Martin, and Zengotita went to defendant's residence to let her know that "the situation was handled."[5]

---

[5] Younger also testified to a similar version of these events.

 A-1320-17T4

Defendant testified. She said she is known in the community as "Momma Elm," but denied gang membership. She denied ordering a hit on Baker and denied conspiring with anyone concerning what occurred in June 2012. She testified that on June 16, she went to Jersey City with Adams, Long, and DePena, as well as Martin, whom she only first met that evening. Her intention was to diffuse an argument between Long and Baker about someone spitting on Long. When Baker came out of Hernandez's residence, defendant asked where the women who spit on Long were. With that, Baker and Martin began to argue, with Baker saying, "I know you didn't bring no lil niggers to fight." Martin said, "I'm not no lil nigger" and demanded respect from Baker, pulled a gun and pointed it at her. Defendant claimed she did not know anyone in the group was in possession of a weapon until that moment.

Defendant testified that she was frightened when she saw Adams and Martin force Baker into the trunk, but she got into the vehicle's front seat because Martin pointed the gun at her and said, "get the fuck in the car." Defendant testified that after they arrived at her Newark residence, Martin ordered the women out and told them "this could happen to any one of y'all." Defendant and the other women ran into defendant's residence, and the others drove off. The next day, defendant moved out of her residence and into her

A-1320-17T4

boyfriend's apartment out of concern that Martin would be coming after her, Long and Younger.

Having heard and considered this and other testimony and evidence, the jury found defendant guilty of conspiracy to commit kidnapping, kidnapping, and felony murder, and acquitted her of murder, conspiracy to commit murder, and the weapons charges.

At sentencing, the trial judge merged the kidnapping and conspiracy convictions into the felony murder conviction for purposes of sentencing, and imposed a sixty-year prison term, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a thirty-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

Defendant appeals. Her merits brief contains three multi-faceted parts, in which she argues: (1) the judge's jury instructions were erroneous in numerous respects; (2) the judge failed to instruct the jury on two applicable defenses; and (3) the sentence was based on improper considerations and excessive.

I

In her first point, defendant argues she was deprived of due process and a fair trial because:

A. The Kidnapping Charge Failed to Instruct the Jury on the Essential Element Which Could Elevate Kidnapping From a Second-Degree Crime to a First-Degree Crime, thereby Lowering the State's Burden and Depriving [Defendant] of Due Process, and, as a Result, her Convictions for Kidnapping, Felony Murder, and Conspiracy to Commit Kidnapping Require Reversal.

B. The Court's Charges on Conspiracy – Both as the Inchoate Crime and as Vicarious Liability – Lessened the State's Burden of Proof and Invaded the Province of the Jury Because the[] [Judge] Repeatedly Referred to the Other People in Question as "Kidnapping Co-Conspirators."

C. The Court Expanded the Indictment by Adding an Additional Factual Basis for a Kidnapping Conviction, Causing Prejudice.

We find insufficient merit in the third aspect of this point to warrant further discussion in a written opinion, R. 2:11-3(e)(2),[6] and discuss the first and second aspects separately.

---

[6] As for our rejection of the argument that the judge expanded the indictment in charging the jury on kidnapping, we would add only the judge's actions were consistent with State v. Smith, 279 N.J. Super. 131, 147-48 (App. Div. 1995). There was no error because defendant was already on notice, from other parts of the indictment, that she was charged with the first-degree murder of Baker, and there was no prejudice because defendant was, in fact, acquitted of both purposeful and knowing murder, conspiracy to commit murder, and the weapons charges.

A-1320-17T4

## A

As to the initial facet of the first point, defendant contends the jury's verdict could not support a conviction of first-degree kidnapping because the judge did not instruct the jury on all the elements that would make it so. In considering this contention, we note that the indictment charged defendant with kidnapping as defined by N.J.S.A. 2C:13-1(b)(1), which declares, in relevant part, that a person is guilty of kidnapping if that person "unlawfully removes another from [her] place of residence . . ., or a substantial distance from the vicinity where [she] is found, or if [she] unlawfully confines another for a substantial period, with [the] purpose[] . . . [t]o facilitate commission of any crime or flight thereafter." The Legislature declared that such conduct constitutes "a crime of the first degree" but "[i]f the actor releases the victim unharmed and in a safe place prior to apprehension, it is a crime of the second degree." N.J.S.A. 2C:13-1(c)(1).

There is no dispute that the judge instructed the jury on the elements contained in N.J.S.A. 2C:13-1(b)(1), but he did not instruct the jurors or seek from them a determination as to whether defendant "release[d] the victim unharmed and in a safe place prior to [her] apprehension," N.J.S.A. 2C:13-1(c)(1). Notwithstanding the undisputed absence of a jury finding on this last

factor, the judge sentenced defendant as if she was convicted of first-degree kidnapping.

Defendant argues in this point that the lack of instructions on this last factor deprived her of a fair trial and due process. We disagree. The trial was fair and the process provided was sufficient. The judge's failure to ask the jury to make the findings necessary to render this kidnapping a crime of the first-degree simply means, as we held in State v. Casilla, 362 N.J. Super. 554, 570-71 (App. Div. 2003), that the verdict rendered means defendant had been convicted of only second-degree kidnapping.

The State argues that the factual differences between this case and Casilla require a different conclusion or, in the alternative, that we should depart from Casilla. We disagree in both respects. The circumstances in Casilla are not fundamentally different from what occurred here. And the State has not persuaded us that Casilla was wrongly decided or that we should plot a different course. In reality, the State seems to argue that the last element that renders kidnapping a first-degree offense was undisputed or implicit in the jury's verdict. But, as Judge Skillman wrote for this court in Casilla, such a verdict – even coupled with a finding of felony murder – cannot be interpreted as including an understanding that defendant "failed to release [the victim] unharmed." Id. at

14

567. No matter how obvious the presence of that factor may seem to the State or the trial judge,[7] defendant's constitutional right to a jury trial includes a right to have the jury find, beyond reasonable doubt, all the elements of a particular offense. See In re Winship, 397 U.S. 358, 364 (1970); State v. Grenci, 197 N.J. 604, 622 (2009); State v. Ragland, 105 N.J. 189, 202 (1986).

While defendant contends that the absence of such an instruction deprived her of a fair trial, we again rely on what we said in Casilla in concluding that we should simply recognize that the jury convicted defendant of only second-degree kidnapping.

### B

As to the second facet of this first point, defendant contends a new trial is warranted because the instructions on conspiracy suggested to the jury that it could assume a conspiracy had occurred. This argument is based on the judge's repeated reference throughout the charge to Martin, Adams, Zengotita, Long, Younger, and DePena, as the "kidnapping co-conspirators." By using this shorthand descriptor to refer to the other alleged participants, defendant argues

---

[7] And is it so obvious that this element was implicitly included in the jury verdict when the jury acquitted defendant of murder and conspiracy to commit murder?

that the judge either eliminated or lessened the jury's need to find beyond a reasonable doubt the existence of a conspiracy.

The State refers us to that part of the jury instructions in which the judge advised the jury that the conspiracy was alleged and it was up to the jurors to determine whether the other individuals and defendant actually conspired; he explained the State's allegations and, within that explanation, advised that the other alleged actors would be referred to throughout his instructions as "the kidnapping co-conspirators":

> [T]he State contends that the defendant committed the crime of kidnapping by her own conduct. The State also alleges that the defendant is legally accountable for this kidnapping based upon the conduct of her co-conspirators. More specifically, the State alleges that the crime of kidnapping was committed by Omar Martin, Karon Adams, Damon Zengotita, Cierra Long, Davia Younger and Francheska DePena (hereinafter the kidnapping co-conspirators) and that the defendant is legally accountable for the crime of kidnapping committed by these persons because the defendant and these persons allegedly conspired to commit that crime.

In short, the judge advised the jury that he would refer to those individuals alleged to be defendant's kidnapping co-conspirators as the "kidnapping co-conspirators." Unfortunately, the judge did not use a preferable shorthand phrase, such as "alleged kidnapping co-conspirators."

The question for us is whether the absence of a word like "alleged" in the shorthand phrase caused prejudice. That is, we must consider whether, with each utterance of "kidnapping co-conspirators" the jurors likely assumed the judge was communicating his or the State's belief there was a kidnapping conspiracy and that the others conspired with defendant. Beyond the judge's earlier definition of what he meant by "kidnapping co-conspirators," which we quoted above, the State argues that the following instruction repeated for the jury the fact that whether there was a kidnapping conspiracy and whether that conspiracy was with one or more of the individuals so described was for the jury to decide:

> [A]fter consideration of all the evidence, if you find beyond a reasonable doubt that a kidnapping co-conspirator committed the crime of kidnapping and also that the defendant conspired with that kidnapping co-conspirator to commit that crime, then you must find the defendant guilty of the crime of kidnapping. If, on the other hand, you have a reasonable doubt that a kidnapping co-conspirator committed the crime of kidnapping, that the defendant conspired with that kidnapping co-conspirator to commit that crime, or both, then you must find the defendant not guilty of the kidnapping through co-conspirator liability.

We agree. While the judge's repetition of "kidnapping co-conspirator" was problematic, the inclusion in the charge of a definition of what the judge meant by that phrase, as well as other instructions that clarified that it was for the jury

17

to decide beyond a reasonable doubt whether there was a conspiracy and the identity of those with whom defendant may have conspired, removed any cloud that the absence of the word "alleged" with each repetition may have caused. Moreover, we note that defense counsel did not object, thereby requiring defendant to show this repeated descriptor was capable of producing an unjust result. R. 2:10-2. Although a better practice would call for the inclusion of the word "alleged" in such a descriptor, we do not find this aspect of the judge's charge to be plainly erroneous.

## II

In this appeal, defendant also argues that the judge erred by failing to instruct the jury on: (a) the felony murder defense, N.J.S.A. 2C:11-3(a)(3), and (b) the defense of duress, N.J.S.A. 2C:2-9. Defendant did not request these instructions at trial, so we examine the record on these points by resorting to the plain-error standard to determine whether their absence was "clearly capable of producing an unjust result." R. 2:10-2. We consider, first, the felony murder defense.

## A

In considering the failure to sua sponte charge the felony murder defense, the Court in State v. Walker, 203 N.J. 73, 86-87 (2010), determined that the

same standard that is applied when a defendant hasn't requested instructions on lesser-included charges applies to a defendant's failure to request the statutory affirmative defense to felony murder. In short, "if [defense] counsel does not request the instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it." Id. at 87. We, thus, turn to the evidence to determine whether all four prongs were "clearly indicate[d]" so as to warrant such a sua sponte instruction. Ibid.

The statutory defense to felony murder applies when there is proof that when the defendant "was not the only participant in the underlying crime," it is an affirmative defense that the defendant:

> (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
>
> (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
>
> (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and
>
> (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

19

[N.J.S.A. 2C:11-3(a)(3).]

There was evidence in the record to support a finding by the jury on the first three prongs. As to the first, the jury heard testimony that defendant was not the person who shot and killed Baker. And while there was testimony to support a finding that she ordered the "hit" on Baker, defendant testified to the contrary. As to the second, there was evidence that defendant was not armed with a deadly weapon during the kidnapping and, again, she testified that she was never in possession of a gun during the events in question. The third prong requires proof that defendant had no reasonable ground to believe that any other participant was armed with a deadly weapon. Defendant testified she did not know anyone was in possession of such a weapon until she saw Martin pull out a gun and point it at Baker in Jersey City. Long and Younger provided similar testimony.

Our consideration of the fourth prong, however, does not lead to such a certain conclusion. Defendant testified that she was aware the women with whom she traveled to Jersey City had a quarrel with Baker and that they planned to fight her. There was also testimony that defendant was aware that her fellow travelers were gang members. Although defendant testified that she went to Jersey City to diffuse the quarrel, the Bidwell Avenue surveillance footage

20

allegedly revealed that defendant watched as Baker was forcibly shoved, at gunpoint, into the trunk, suggesting defendant reasonably believed at least some of the other participants intended to cause serious bodily injury.

Even if we were to view the evidence expansively to reach a conclusion that the fourth prong was "clearly indicat[ed]," we find no prejudice to defendant's right to a fair trial by the omission of the statutory affirmative defense. In <u>Walker</u>, the Court found that a trial court's failure to charge the defense did not constitute plain error because there "the findings of the jury negated most of the factors required to establish the affirmative defense," stating:

> [I]n addition to felony murder, the jury convicted defendant of conspiracy, robbery, reckless manslaughter as a lesser-included offense of knowing or purposeful murder, and possession of a knife. For those convictions, the jury had to conclude that defendant aided the commission of the homicidal act, (reckless manslaughter); possessed a deadly weapon, (possession of a knife); had reason to believe the codefendant was armed with a knife, (conspiracy and reckless manslaughter); and engaged in conduct likely to result in death or serious physical injury, (reckless manslaughter). Thus, the jury, although not charged with the affirmative defense to felony murder, found against defendant on most, if not all, of the four prongs of the defense.
>
> [203 N.J. at 78, 90.]

It is true the jury acquitted defendant of conspiracy to commit murder, murder, and both weapons offenses; that would support her argument about the first two prongs of the affirmative defense. But the jury convicted defendant of conspiracy to commit kidnapping and kidnapping and, therefore, found facts that would have negated the defense's fourth prong. So, we reject the argument that the judge's failure to sua sponte instruct on this defense was clearly capable of producing an unjust result.

B

We also examine defendant's argument that the judge erred by failing to instruct the jury on the defense of duress in the same manner, since defendant failed to request that instruction at trial. To repeat, a trial judge's obligation to charge the jury on a defense not urged by a defendant is not a self-executing duty. State v. Rivera, 205 N.J. 472, 489-90 (2011). The duty arises only when the evidence clearly indicates the need for or clearly warrants the unrequested jury instruction. Ibid.

N.J.S.A. 2C:2-9 makes it an affirmative defense "that the actor engaged in the conduct charged . . . because he [or she] was coerced to do so by the use of, or a threat to use, unlawful force against his [or her] person or the person of another, which a person of reasonable firmness in his [or her] situation would

22

have been unable to resist." The burden of introducing "some evidence of the defense" is on the defendant, while the burden of proof is "on the State to disprove the affirmative defense beyond a reasonable doubt." State v. Romano, 355 N.J. Super. 21, 35-36 (App. Div. 2002).

Defendant argues that the need for such an instruction was clearly indicated by the evidence. She refers to her own testimony that she was engaged in a verbal dispute with Hernandez when Martin pulled out a gun and pointed it at Baker's head. Defendant testified that she became "scared" when she watched Baker get forced into the trunk and did not "know what was going on at that point." She also claimed that once seated in the front passenger seat, she began to cry while Martin, in the backseat, yelled and held the gun pointed toward her.

That version, however, was not supported by the testimony of others. Neither Long nor Younger testified they saw Martin point the gun at defendant or heard him yell at her to get in the car. Moreover, the surveillance video fails to substantiate defendant's belated claim of coercion. Instead, the video shows, as the prosecutor argued at trial, that after the trunk lid closed on Baker, defendant "wave[d] [the others] on" and the others got into the car, while no one at that time was pointing a gun at defendant. As the prosecutor argued, defendant "[c]almly hand[ed] the phone back, walk[ed] over, [and] [got] into the

front seat." The video reveals that others are "shocked" by what has occurred, but defendant "finish[ed] her phone conversation, watch[ed] as they put [Baker] in the trunk of that car, [and] wave[d] them into the car," after which defendant "calmly g[o]t into that car."

We agree that the evidence does not "clearly indicate" the need for the affirmative defense of duress and that its absence from the jury charge was not capable of producing an unjust result in light of the jury's other findings.

III

In her third point, defendant argues that the trial judge "unquestionably abused [his] discretion and imposed a manifestly excessive sentence." Her argument consists of the following six subpoints:

> A. The Sentencing Court Improperly Relied on Evidence Contrary to the Jury's Verdict to Enhance [Defendant's] Sentence.
>
> B. The Trial Court Relied on Improper Evidence to Support . . . Finding[s] of Aggravating Factors, [Specifically] . . . Aggravating Factor[s] Three, . . . Five, . . . Six, . . . [and] Nine.
>
> C. The Court Improperly Balanced Aggravating and Mitigating Factors.
>
> D. [Defendant's] Sentence was Grossly and Erroneously Disproportionate From Those of Martin and Adams.

E. [Defendant's] Sentence was Illegal Because the Jury Did Not Find That She was Guilty of First-degree Kidnapping, Beyond a Reasonable Doubt, and First-degree Kidnapping was the Basis For All Three Charges at Sentencing.

F. The Sentencing Court's Bias and Overreaching Requires a Remand for Resentencing and/or New Trial Before a New Judge.

We do not reach all of defendant's arguments, including her contention that the sentence was disproportionate when compared to those imposed on others, because we agree, for the reasons that follow, that defendant must be resentenced.

First, we note the judge merged the second-degree conspiracy conviction and the first-degree kidnapping conviction into the first-degree felony murder conviction, and imposed a sixty-year prison term, with parole ineligibility periods based on both the No Early Release Act and the Graves Act. Because defendant was sentenced as if convicted of first-degree kidnapping when, in fact, she was convicted only of second-degree kidnapping, we must vacate the sentence imposed and remand for resentencing. Second, resentencing is necessitated by the judge's utilization of his own view of the facts, which contradicted the jury's verdict.

To start, what seems to have been put aside at sentencing was that the jury acquitted defendant of murder, conspiracy to commit murder, and both weapons offenses. Instead, in sentencing defendant, the judge determined that defendant was the prime mover in all that occurred; for example, the judge declared at sentencing that

> Michelle Paden-Battle set forth a series of events. She orchestrated, she was the master mind, she was the supervisor, she was the driving force in this kidnap[p]ing and execution of Regina Baker.
>
> [Emphasis added.]

In other statements, the judge stressed that defendant: used "her apparent authority within the Bloods [in declaring] that Regina Baker was food and that her life shall cease"; was "the moving force behind this senseless act of brutality"; exercised her "desire to impose gang-discipline [as] the motive for the murder of Ms. Baker"; and was "more culpable [than the shooter] due to her supervisory role over these co-defendants [in] the commission of the kidnap[p]ing and homicide" (emphasis added). In essence, the judge sentenced defendant based on his own view of the evidence, finding that even though defendant "did not pull the trigger," others did "on her orders" (emphasis

added).[8] The State candidly acknowledges that this is what the judge did, arguing in its brief that "[i]t was not improper for [the judge] to credit evidence that the jury did not." We disagree.

"An acquittal is accorded special weight." United States v. DiFrancesco, 449 U.S. 117, 129 (1980); see also State v. J.M., 438 N.J. Super. 215, 233-34 (App. Div. 2014), aff'd as modified, 225 N.J. 146 (2016). An acquittal means that the defendant retains the presumption of innocence; that the State failed to rebut that presumption. The Supreme Court stated long ago that "a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." Coffin v. United States, 156 U.S. 432, 453 (1895). The Court invoked this concept again when reaching its landmark decision in In re Winship, 397 U.S. at 362-63, as did our own Supreme Court in State v. Hill, 199 N.J. 545, 559 (2009).

If this "presumption of innocence" still constitutes a bedrock constitutional principle, then it must mean that once acquitted, the accused must

---

[8] It is certainly true that defendant was convicted of felony murder, but that verdict was not based on defendant having "order[ed]" Baker's "execution." Had the jury found that fact beyond a reasonable doubt, it would have convicted instead of acquitted her of first-degree murder.

be viewed as innocent – not just not guilty – of the acquitted charge. See State v. Cote, 530 A.2d 775, 785 (N.H. 1987).[9] Here, the jury's acquittal of defendant on the murder, conspiracy to commit murder, and the weapons charges constituted at sentencing hardly a "speed bump." United States v. Bell, 808 F.3d 926, 929 (D.C. Cir. 2015) (Millett, J., concurring).

It may be, as a matter of federal constitutional law, that a sentencing judge may do what this judge did because of United States v. Watts, 519 U.S. 148 (1997), although Watts' vitality is doubtful when considering it was soon followed by Apprendi v. New Jersey, 530 U.S. 466 (2000), and United States v. Booker, 543 U.S. 220 (2005), both of which placed considerable limits on a sentencing judge's use of facts other than those found by a jury through the constitutionally-required reasonable-doubt standard. In fact, in a footnote, the Booker majority observed that "Watts, in particular, presented a very narrow question regarding the interaction of the [Federal Sentencing] Guidelines with

---

[9] The Attorney General, in his amicus brief, relies on State v. Kelly, 406 N.J. Super. 332, 347 (App. Div. 2009), in suggesting an acquittal is not an actual finding but simply acknowledgement of the State's failure to prove guilt beyond a reasonable doubt. We disagree. Our Supreme Court has recognized that the presumption of innocence "is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created." Hill, 199 N.J. at 559 (emphasis added and quoting Coffin, 156 U.S. at 459).

the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument."  Booker, 543 U.S. at 240 n.4.  That footnote prompted Michigan's highest court to observe that the five-member Booker majority had given Watts "side-eye treatment" and "explicitly limited it to the double-jeopardy context," People v. Beck, 939 N.W.2d 213, 224 (Mich. 2019), not applicable here.

In Beck, 939 N.W.2d at 229-30, the Court concluded that a sentencing judge's use of acquitted conduct constituted a due process violation, as have other state courts.  See Bishop v. State, 486 S.E.2d 887, 897 (Ga. 1997); McNew v. State, 391 N.E.2d 607, 612 (Ind. 1979); Cote, 530 A.2d at 785; People v. Black, 821 N.Y.S.2d 593, 596-97 (App. Div. 2006); State v. Marley, 364 S.E.2d 133, 139 (N.C. 1988).  The practice has also been criticized by a circuit judge now sitting on the Supreme Court.  See Bell, 808 F.3d at 928 (Kavanaugh, J., concurring) (stating that "[a]llowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial").  And other circuit judges, albeit a minority, have joined the chorus in criticizing the practice.  See United States v. Brown, 892 F.3d 385, 408 (D.C. Cir. 2018) (Millett, C.J., concurring) (asserting that "allowing courts at sentencing 'to

materially increase the length of imprisonment' based on conduct for which the jury acquitted the defendant guts the role of the jury in preserving individual liberty and preventing oppression by the government"); United States v. Mercado, 474 F.3d 654, 662 (9th Cir. 2007) (Fletcher, J., dissenting) (recognizing "[s]uch a sentence has little relation to the actual conviction, and is based on an accusation that failed to receive confirmation from the defendant's equals and neighbors"); United States v. Faust, 456 F.3d 1342, 1349 (11th Cir. 2006) (Barkett, J., concurring) (stating a "strong[] belie[f] . . . that sentence enhancements based on acquitted conduct are unconstitutional under the Sixth Amendment, as well as the Due Process Clause of the Fifth Amendment"). See also James J. Bilsborrow, Note, Sentencing Acquitted Conduct to the Post-Booker Dustbin, 49 Wm. & Mary L. Rev. 289, 333 (2007); Barry L. Johnson, The Puzzling Persistence of Acquitted Conduct in Federal Sentencing, and What Can Be Done About It, 49 Suffolk U. L. Rev. 1, 26 (2016); Orhun Hakan Yalincak, Critical Analysis of Acquitted Conduct Sentencing in the U.S.: "Kafka-Esque," "Repugnant," "Uniquely Malevolent" and "Pernicious"?, 54 Santa Clara L. Rev. 675, 723 (2014); Mark T. Doerr, Note, Not Guilty? Go to Jail. The Unconstitutionality of Acquitted-Conduct Sentencing, 41 Colum. Hum Rts. L. Rev. 235, 252-56 (2009); Lucius T. Outlaw III, Giving an Acquittal Its

Due:  Why a Quartet of Sixth Amendment Cases Means the End of United States v. Watts and Acquitted Conduct Sentencing, 5 U. Denv. Crim. L. Rev. 173, 187-89 (2015).  We share Judge Bright's sense of "wonder" at "what the man on the street might say about this practice of allowing a prosecutor and the judge to say that a jury verdict of 'not guilty' for practical purposes may not mean a thing." United States v. Canania, 532 F.3d 764, 778 (8th Cir. 2008) (concurring opinion).

Even if we were willing to assume that Watts is not offensive to federal constitutional principles, there is nothing in our jurisprudence that suggests the New Jersey Constitution would fail to give an acquittal the rightful place at sentencing it deserves.  Our Supreme Court has recently spoken about this subject.  In State v. Tillery, 238 N.J. 293, 326-27 (2019), the Court considered an appeal of a sentence where the judge had relied on a view of the evidence on which the jury was deadlocked, and expressed concerns about a sentencing judge's use of such information when the defendant faced the potential of being tried again on the deadlocked counts.  However one might view Tillery's impact on an acquitted charge, the Court clearly held that courts should not consider evidence offered on deadlocked charges at sentencing "unless and until the defendant no longer faces the prospect of prosecution for those charges."  Id. at

31

Despite its references to <u>Watts</u>, the Court did not resolve the question posed here about the significance of an acquittal at sentencing.

Instead, not long after <u>Tillery</u>, the Court granted certification to consider the precise issue now before us. If, as the State has argued, <u>Tillery</u> was dispositive, the Court would not have had to grant certification in another case to resolve this very issue. <u>See</u> <u>State v. Melvin</u>, 240 N.J. 549 (Jan. 31, 2020), granting certification in <u>State v. Melvin</u>, No. A-4632-17 (App. Div. July 8, 2019). The Court's order granting certification expressly declares the Court's intention to determine whether "the sentencing judge could consider defendant's conduct even though the jury acquitted defendant of the underlying crimes." <u>Melvin</u>, 240 N.J. at 549. Until the Court resolves the issue posed in <u>Melvin</u>, we do not view <u>Tillery</u> as conclusive and we cannot agree, based on existing principles, that a sentencing judge may adopt a view of the evidence in marked contrast to a jury's acquittal.

<u>Tillery</u>, as mentioned, does not resolve the issue before us. If anything, it supports our view because the Court ended the practice of sentencing judges using their own view of evidence adduced at deadlocked proceedings. If judges are foreclosed from considering evidence of charges on which the jury was deadlocked – because it would unfairly expose the defendant to the potential of

being punished twice for the same offense – why, once the deadlock is resolved in a defendant's favor, would it be appropriate for a sentencing judge to disavow the verdict by sentencing a defendant as if convicted of the acquitted charge? To condone consideration of evidence that led to an acquittal eviscerates the very spirit of the double jeopardy clause, let alone the accused's rights to the presumption of innocence and a trial by jury. If the double jeopardy clause prevents multiple punishments and protects against multiple prosecutions, it must also preclude the relitigation of, and punishment for, a crime that a jury of the defendant's peers and neighbors determined defendant did not commit.

Lastly, we conclude – and we do not understand the State to argue otherwise – that the judge's belief that defendant ordered Baker's execution, despite the jury verdict, enhanced the sentence imposed. That is, the judge imposed a sixty-year prison sentence because of his view of the evidence; he did not express his own personal view of the evidence for any other reason. In speaking for the Court in Townsend v. Burke, 334 U.S. 736, 740 (1948), Justice Jackson wrote that a sentencing judge's consideration of acquitted conduct "savors of foul play or of carelessness," and when uncertain about its influence on a sentence, an appellate court is "not at liberty to assume that items given such emphasis by the sentencing court did not influence the sentence." A review

of the sentencing transcript suggests no doubt that the sentence was enhanced because the judge believed defendant ordered Baker's execution; to the extent there is doubt, enhancement based on inappropriate information must be assumed. Id. at 740-41. And, so, we remand for resentencing not just because the judge could not lawfully sentence defendant on first-degree kidnapping, but also because the judge relied on a view of the evidence the jury refused to adopt. In sentencing a defendant, the judge's "sense of moral outrage" cannot trump the jury's verdict. See State v. Tindell, 417 N.J. Super. 530, 571 (App. Div. 2011).

We need not express a view on the other sentencing arguments presented by defendant[10] because we deem such an analysis unnecessary in light of the

---

[10] For example, the judge applied both aggravating factor six, N.J.S.A. 2C:44-1(a)(6), which allows a sentencing judge to consider "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which [s]he has been convicted," and mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), which allows the court to consider that the defendant "has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense." Since the record reveals that defendant's criminal history includes only third-degree convictions, in 1998 and 2000, for which she received probationary terms, and nothing else until committing the offenses discussed here, it is understandable why mitigating factor seven would have application; considering the same facts, it is not clear how or why aggravating factor six would apply at the same time. In any event, in light of our disposition of this appeal, we need not further examine this issue or the application of the other aggravating factors that defendant challenges in this appeal, including defendant's argument that by applying aggravating factor three, N.J.S.A. 2C:44-1(a)(3), which allows for consideration

A-1320-17T4

other circumstances discussed above, all of which require that defendant be resentenced by a different judge.  See State v. Kosch, 458 N.J. Super. 344, 355 (App. Div. 2019); Tindell, 417 N.J. Super. at 573; State v. Henderson, 397 N.J. Super. 398, 416 (App. Div. 2008), aff'd and modified on other grounds, 208 N.J. 208 (2011).

\* \* \*

To summarize, we affirm defendant's convictions, with the exception that we hold the jury verdict must be understood as reaching the conclusion that defendant committed second-degree kidnapping.  We also conclude that the judge erroneously enhanced the sentence based on his personal view that defendant committed the offenses for which she was acquitted.  We, therefore, vacate the sentence, remand for resentencing by another judge, and entry of a new judgment of conviction.

---

that defendant will commit another crime, that was apparently based on defendant's refusal to confess or concede her guilt or because the judge believed defendant perjured herself both at trial and in her allocution.  See State v. Poteet, 61 N.J. 493, 495-98 (1972).  Defendant also challenges the sufficiency of the evidence of defendant's gang membership on which the judge relied in finding aggravating factor five, N.J.S.A. 2C:44-1(a)(5), which allows the judge to consider the substantial likelihood that the defendant is involved in organized crime. On resentencing, we expect the next judge to reexamine all these issues anew.

Affirmed in part, vacated in part, and remanded for resentencing.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION